IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KELLY OSCAR,<br>JACK OSCAR, | §<br>§<br>§ | No. 531, 2024 |
| Respondents- Below,<br>Appellant, | §<br>§<br>§ | Court Below—Family Court<br>in and for Sussex County |
| v. | §<br>§ | |
| LARRY LAFFERTY, | §<br>§ | File No.　　CS23-07221<br>Petition No.　23-17205 |
| Petitioner-Below,<br>Appellee. | §<br>§<br>§ | |

Submitted: August 13, 2025
Decided:　October 22, 2025

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

**ORDER**

This 22nd day of October, 2025, after consideration of the parties' briefs and the record on appeal, it appears to the Court that:

(1)　Under 13 *Del. C.* §8-204(a)(1), "[a] man is presumed to be the father of a child if . . . [h]e and the mother of the child are married to each other and the child is born during the marriage[.]"　Larry Lafferty  filed a petition seeking custody of the minor child Audrey Lafferty-Oscar ("Audrey").[1]　Kelly Oscar (the "Mother")

---

[1] The court assigned the parties pseudonyms under Supreme Court Rule 7(d).  Non-party relatives are given the surnames assigned to the parties as pseudonyms.

moved to dismiss the petition, arguing that Lafferty is not Audrey's legal father because the Mother was still married to Jack Oscar at the time of Audrey's birth.

(2)  The Family Court held a parentage hearing. Under 13 *Del. C.* § 8-607 " a presumed father, the mother or another individual to adjudicate the parentage of a child having a presumed father must be commenced not later than 2 years after the birth of the child." But under 13 *Del. C.* § 8-607 (b)(1) "[a] proceeding seeking to disprove the father-child relationship between a child and the child's presumed father may be maintained at any time if the Court determines that . . . . [t]he presumed father never openly held out the child as his own[.]" The court found that Lafferty was Audrey's legal father, even though his petition was filed outside the two-year statutory period, because Oscar—the presumed father—had never openly held Audrey out as his own. Mother appealed and now contends that the court erred by focusing on whether Oscar held out Audrey as his own within two years of her birth and in its ultimate finding that Oscar did not hold out Audrey as his own. For the reasons set forth below, we affirm.

(3)  Mother married Oscar in 2012. Three years later, Mother gave birth to their child Zoe Oscar ("Zoe"). Mother, Oscar, and Zoe lived together in Centerville, Maryland until December 2018 when Mother moved to an apartment in Georgetown so that she could be closer to her workplace. At this point, Mother and Oscar were

still married but had ceased all sexual relations, maintaining an open marriage with both free to date other people.

(4)     Mother began dating Lafferty in the fall of 2018. Lafferty did not initially know that Mother was still married to Oscar but was informed of this fact by Mother shortly after the start of their relationship. In the summer of 2019, Lafferty moved into Mother's Georgetown residence. While Mother and Lafferty lived together, Mother became pregnant with Audrey. All agree that Lafferty is Audrey's biological father.

(5)     When Mother first told Lafferty about her pregnancy, he was upset and asked Mother to have an abortion. But Mother proceeded with the pregnancy. She designated Lafferty as the one person she could have with her in the delivery room under COVID-19 restrictions.

(6)     Audrey was born on August 5, 2020. Mother listed "Lafferty-Oscar" as Audrey's last name but declined to name anyone as the father on the birth certificate. Mother also did not provide either Lafferty or Oscar with the two paternity forms given to her by the hospital. Mother and Lafferty left the hospital with Audrey and returned to the Georgetown apartment. They would reside together for a few months before Lafferty moved into the residence of his mother, Carla Lafferty ("Paternal Grandmother").

(7) Lafferty saw Audrey regularly throughout 2021 and the beginning of 2022. When Mother's maternity leave ended, the Paternal Grandmother and Lafferty took over Mother's childcare responsibilities. The Paternal Grandmother provided daily care for Audrey from October 2020 until February 2021. Lafferty bought formula and helped the Paternal Grandmother look after Audrey. He picked her up from daycare fourteen times. Lafferty also offered to set up a direct deposit to the Mother's bank account to provide financial support for Audrey, but the Mother declined his offer, testifying that she felt uncomfortable giving him access to her account. In February 2022, Mother urged Lafferty to file for custody. Lafferty refused to do so, telling Mother by text message that he was "not having the courts involved in [his] life or [his] child's."[2] In March 2022, Mother and Lafferty ended their relationship.

(8) That same month, Mother and Oscar sold their residence in Centerville, Maryland. Oscar and Zoe then moved to Delaware to be closer to Mother.

(9) Before the move, Oscar was not actively involved in taking care of Audrey. His support was confined to depositing money in his joint bank account with Mother, which Mother used to take care of Zoe and purchase baby items for Audrey. Oscar believed that he began to hold out Audrey as his own in the summer

_____

[2] Opening Br. Ex. A at 13.

of 2022, after Mother asked him to watch Audrey more often.   In the Family Court, Oscar testified that

> . . . first and foremost, I love my daughter Zoe.  She has a sister. There are no halves in this family.  And so I'm going to do everything I can to make sure that my daughter – everything that I do is about my daughter and to make sure that she is safe and loved.  And ignoring requests to assist with taking, you know, Audrey along with her is not a position that I was ever going to take.[3]

(10)   On July 25, 2022, Oscar picked Audrey up from daycare for the first time.   In the fall of 2022, he had Zoe and Audrey on alternating weekends and watched them on Tuesday and Thursday nights.  By the fall of 2023, Mother and Oscar had started a shared placement schedule that evenly split the amount of time the girls spent with Mother and Oscar.  When he had both girls, Oscar provided them with meals, clothes, and whatever else they needed.  He testified that Audrey has called him "Dada" or "Daddy,"[4] and that he refers to her as his "youngest daughter" or "Zoe's sister."[5]  Oscar also continued to support Mother financially.

(11)   During this period, Lafferty's contact with Audrey decreased.   He stated that this was because his access to Audrey was dependent on his relationship status with Mother and his willingness to engage in sexual activity with Mother.

---

[3] App. to Opening Br. at A139.
[4] *Id*. at A153.
[5] *Id*. at A159–60.

This dynamic, according to Lafferty, is what led Mother to block his cell phone number and deny him access to Audrey in May 2023.

(12) Prompted by Mother's decision to deny him access to Audrey, Lafferty filed a petition for custody in August 2023. Mother moved to dismiss the petition on the grounds that Lafferty had waited more than two years from Audrey's birth to file the petition. This delay, Mother argued, meant that Lafferty's petition was time-barred by 13 *Del. C.* § 8-607(a). Mother argued further that Oscar had "openly held out" Audrey as his own, so Lafferty could not rely on § 8-607(b) to avoid the two-year limitations period.

(13) Unable to resolve the custody dispute before determining Audrey's parentage, the Family Court held two days of parentage hearing. The court found that Oscar had never openly held out Audrey as his own, emphasizing the fact that he only cared for Audrey as Zoe's sister and that he and Mother only started their shared placement arrangement more than two years after Audrey's birth. And because Mother and Oscar were not cohabiting and did not engage in sexual intercourse during the probable time of Audrey's conception as required by § 8-607(b)(1)(a), the court concluded Lafferty could bring a proceeding to adjudicate parentage outside the § 8-607(a)'s two-year limitations period. Based on these findings, the court concluded that Lafferty was Audrey's legal father.

6

(14)    Mother and Oscar appealed.  They contend that the Family Court erred by focusing on whether Lafferty held out Audrey as his own within two years of her birth and in its ultimate finding that Oscar did not hold out Audrey as his own.

(15)    We review the Family Court's legal rulings *de novo*.[6]  Statutory interpretation is a question of law which we review *de novo*.[7]  "If the Family Court has correctly applied the law, our review is limited to abuse of discretion."[8]  Our review of the Family Court's factual findings is limited to ensuring that they are supported by the record and not clearly erroneous.

(16)    When a woman gives birth while married, her husband is the presumed father of the child.  Under 13 *Del. C.* § 8-201(b)(1), "The father-child relationship is established between a man and a child by . . . [a]n unrebutted presumption of the man's paternity of the child under § 8-204 of this title[.]"  And as mentioned earlier under § 8-204(a)(1), "[a] man is presumed to be the father of a child if . . . [h]e and the mother of the child are married to each other and the child is born during the marriage[.]"  There is no question that here, Oscar is Audrey's presumptive father because he was married to Mother at the time of Audrey's birth.

(17)    Section 8-607 provides a two-year limitations period for challenging the paternity of a child with a presumed father.  Section 8-607(a) states that "a

---

[6] *Long v. Div. of Fam. Servs.*, 41 A.3d 367, 370 (Del. 2012).
[7] *Riad v. Brandywine Valley SPCA, Inc.*, 319 A.3d 878, 883 (Del. 2024).
[8] *Long v. Div. of Fam. Servs.*, 41 A.3d 367, 370 (Del. 2012).

proceeding . . . to adjudicate the parentage of a child having a presumed father must be commenced not later than 2 years after the birth of the child." Section 8-607(b) adds, however, that "[a] proceeding seeking to disprove the father-child relationship between a child and the child's presumed father may be maintained at any time if the Court determines that:

> (1) a. The presumed father and the mother of the child neither cohabited nor engaged in sexual intercourse with each other during the probable time of conception; and
>
> b. The presumed father never openly held out the child as his own[.]

(18) It is undisputed that Lafferty did not file a proceeding to adjudicate Audrey's parentage within the two-year limitations period in § 8-607(a). The parties also do not dispute the fact that Mother and Oscar were not cohabiting and did not engage in sexual intercourse with each other during the probable time of Audrey's conception as required by § 8-607(b)(1)(a). All that was left for the Family Court to determine was whether Oscar "never openly held out [Audrey] as his own" as required by § 8-607(b)(1)(b).

(19) The Family Court correctly described this standard, but its analysis under § 8-607(b)(1)(b) began by "[f]ocusing on the two-year period following Audrey's birth."[9] Mother and Oscar contend that the decision to frame the analysis using the two-year period beginning when Audrey was born was erroneous because

---

[9] Opening Br. Ex. A. at 37.

the plain language of the statute requires the court to determine whether Oscar "never" openly held out Audrey as his own. Their interpretation of the statute is correct.

(20) Where a statute's text is unambiguous, our "role is limited to an application of the literal meaning of the statute's words."[10] That is, when "a statute is unambiguous, there is no need for judicial interpretation, and the plain meaning of the statute controls."[11] There is no ambiguity in § 8-607(b)(1)(b). To bring an action outside the two-year window in § 8-607(a), the plain language of § 8-607(b)(1)(b) requires the Family Court to determine that "[t]he presumed father *never* openly held out the child as his own." The word "never" in this context is unambiguous. "Never" means "not ever" or "at no time."[12] Thus, the scope of our analysis is not confined to the two years in which a third party could bring an action to determine parentage.

(21) Although it does appear that the court incorrectly trained its attention at the outset of its analysis on the two years following Audrey's birth, the remainder of its factual findings and the record as a whole support a finding that Oscar never openly held Audrey out as his own.

---

[10] *Dennis v. State*, 41 A.3d 391, 393 (Del. 2012).
[11] *Eliason v. Englehart*, 733 A.2d 944, 946 (Del. 1999).
[12] *Never*, Merriam Webster, https://www.merriam-webster.com/dictionary/never.

(22) No court in Delaware has explicitly defined what it means for a presumed father to "openly hold out a child as his own." Mother and Oscar state that there is no "cut and dried" definition, and that any standard must leave the Family Court some "flexibility" in its application of facts to law.[13] This section of the statute is also unambiguous. "Openly" means "do[ne] . . . without hiding any facts" or "completely free from concealment: exposed to general view or knowledge."[14] The word's most direct synonym is "publicly."[15] To "hold out" means "to represent to be."[16] Thus, the plain meaning of § 8-607(b)(1)(b) is that, to maintain the two-year limitations period, Oscar's holding out of Audrey as his child must have been public-facing and exposed to general view or knowledge.

(23) A review of the Family Court's factual findings shows that Oscar never openly held out Audrey as his own. The Family Court found that "from the time Audrey was born, [Oscar] acted as Zoe's father and [Lafferty] acted as Audrey's father."[17] This factual finding is adequately supported by the record. Oscar testified that he did "everything . . . to make sure that any relation [Audrey] to [his] daughter [Zoe] is taken care of."[18] In other words, Oscar took care of Audrey not because she

---

[13] Opening Br. at 13.
[14] *Openly*, Collins, https://www.collinsdictionary.com/us/dictionary/english/openly; *Open*, Merriam Webster, https://www.merriam-webster.com/dictionary/open.
[15] *See Publicly*, Merriam Webster, https://www.merriam-webster.com/dictionary/publicly (defining "publicly" as "openly").
[16] *Hold Out*, Merriam Webster, https://www.merriam-webster.com/dictionary/holdout.
[17] Opening Br. Ex. A at 39.
[18] *Id*. at 38 n.99.

was his daughter, but because she was Zoe's sister. The Family Court also found that the only person who "held out" Oscar as Audrey's parent was Mother, who placed his name on paperwork for daycare and gymnastics lessons. We see nothing in the record that would warrant disturbing this factual finding.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Family Court be AFFIRMED.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice